Viviano, J.
(dissenting).
(However convenient [intrusions on the,right to trial by jury] may appear at first... let it be again remembered that delays and little inconveniences in the forms of justice are the price that all free nations must pay for their liberty in more substantial matters; that these inroads upon this sacred bulwark of the nation are fundamentally opposite to the spirit of our constitution; and that, though begun in trifles, the precedent may gradually increase and spread, to the utter disuse of juries in questions of the most momentous concern.
—Sir William Blackstone[1]
The issue in this case is whether the juror’s oath, which for centuries has been thought of as the very essence of the jury, may be dispensed with as nothing more than a hollow incantation. There are few, if any, social customs more fundamental to a well-ordered society than the act of swearing an oath. Oaths are invoked in the most solemn occasions in civic life, including when citizens are called to sit in judgment of their peers. Today, the Court holds that the failure to administer the juror’s oath does not seriously affect the fairness, integrity, or public reputation of this criminal case. I cannot agree with this conclusion because it *130 renders meaningless the requirement—in existence since the very origin of the jury trial—that those who judge another person’s guilt or innocence do so under the solemn obligation and sanction of an oath or affirmation. The juror’s oath plays an essential role in every criminal trial, one that cannot so easily be dispensed with by identifying trial features present in every criminal case, as the Court does today. For that reason, I respectfully dissent.
I. THE PLAIN ERROR STANDARD
Because defendant did not preserve his claim that the trial court failed to swear the jury, this issue is reviewed under the plain error standard.[2] Under this standard, appellate courts may grant relief if the person asserting the error can satisfy four elements (the Carines prongs): (1) an error occurred; (2) the error is “plain,” that is, clear or obvious; and (3) the plain error affected substantial rights, that is, affected the outcome of the lower court proceedings.[3] If these three elements are satisfied, the fourth element calls on an appellate court to “exercise its discretion in deciding whether to reverse.”[4] Relief is only warranted when the court determines that the plain, forfeited error resulted in the conviction of an actually innocent defendant or “seriously affect[ed] the fairness, integrity or public reputation of [the] judicial proceedings . . . .”[5]
As discussed below, I would hold that the failure to swear the jury amounted to a literal deprivation of *131 defendant’s Sixth Amendment right to a jury trial.[6] I would also hold that this error was plain. Finally, I would hold that an unsworn jury constitutes a structural error that is not amenable to the prejudice inquiry under the third Carines prong. These three premises establish that the failure to swear the jury has a fundamental and serious effect on the integrity of the proceedings; the features of the trial record that the majority cites to conclude otherwise do not mitigate the fundamental unfairness that results when a defendant is tried by an unsworn jury.
II. THE SIXTH AMENDMENT GUARANTEES A SWORN JURY
The first question—one that the majority does not address—is whether the trial court committed an error in failing to properly swear the jury. The prosecution concedes that the trial court erred by failing to give the oath required by court rule and statute.[7] However, the basis of defendant’s argument is that the trial court’s error was constitutional in nature, as evidenced by his citation of the Court of Appeals’ decision in People v Allan[8] and his contention that the error in this case was structural. In Allan,[9] the Court of Appeals relied *132 on an earlier Court of Appeals case, People v Pribble, which held that “[t]he oath is designed to protect the fundamental right of trial by an impartial jury.”[10] Neither Pribble nor Allan provided an extended constitutional analysis, but they present an important issue not yet squarely addressed by this Court or the United States Supreme Court: whether the juror’s oath is constitutionally required as part of the Sixth Amendment’s guarantee to a trial by jury.[11]
The language of the Sixth Amendment reads, “In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ,”[12] In interpreting the constitutional phrase “trial by jury,” the guiding principle is “to give the text the meaning it was understood to have at the time of its adoption by the people.”[13] The language of the Constitution is the primary indicator of that understanding.[14] When interpreting the Constitution, we presume that “its words and phrases were used in their normal and ordinary as distinguished from technical *133 meaning.”[15] Our interpretation of the constitutional text “is necessarily influenced by the fact that its provisions are framed in the language of the English common law, and are to be read in the light of its history.”[16] This is especially so for the right to trial by jury because it is a basic fact of our constitutional heritage that the ratification of the Sixth Amendment marked the preservation of a long-cherished institution born of English common law.[17]
For as long as the institution we know as “trial by jury” has existed, juries have been sworn. Oaths were already a deeply embedded custom in civic society when the jury trial emerged as the accepted mode of criminal trial.[18] When that happened, “[the oath] became an integral part of the jury trial and by the earliest records both jurors and witnesses were sworn.”[19] Indeed, from the inception of the jury trial, “[i]t was the power of the oath which decided the case . . . .”[20] By the time Sir William Blackstone wrote *134 his Commentaries on the Laws of England in the mid-eighteenth century, the role of the oath had become so firmly ensconced in the concept of the jury that the body known as “the jury” did not exist until its members swore an oath:
When a sufficient number of persons impaneled, or talesmen, appear, they are then separately sworn, well and truly to try the issue between the parties, and a true verdict to give according to the evidence, and hence they are denominated the jury, jurata and jurors, [namely] jura-tores.l[21]]
The essence of the jury is, and always has been, the swearing of the oath.[22] This basic historical fact finds compelling support in the etymological roots of the word “jury,” which can be traced back to the French words “juré” and “jurée” and the Latin word “jurare,” which mean “sworn,” “oath,” and “to swear,” respectively.[23] The English ancestor of our “jury” was called *135 “the jurat a,”[24] which itself was defined as “[a] jury of twelve men sworn.”[25] Furthermore, at the time our Constitution was written, “jury” was defined as “a company of men, as twenty-four, or twelve, sworn to deliver a truth upon such evidence as shall be delivered them touching the matter in question.”[26] Nearly every definition of “jury’ since then includes reference to swearing an oath.[27] In other words, the oath was, and has always been, a defining criterion of “jury.”[28] In *136 light of this deep etymological pedigree, it seems quite implausible that the Framers, who lived in a time in which society placed great emphasis on oaths,[29] intended anything other than a sworn jury when they drafted the Sixth Amendment. The term “jury” in the Sixth Amendment naturally referred to a “sworn” jury; adding the descriptor “sworn” would have seemed redundant.
That the Framers understood the word “jury” to necessarily include a requirement that the decision-making body swear an oath finds support in a contextual reading of the Constitution, particularly the provision granting the Senate the power to try all impeachments.[30] An early version of Article I, § 3 simply authorized the Senate to try all impeachments.[31] However, it was later revised to explicitly state that “every member shall be on oath[.]”[32] Elucidating the oath requirement in his Commentaries on the Constitution, Justice Joseph Story wrote:
[T]he Senate, when sitting as a court of impeachment, ‘shall be on oath or affirmation’; a provision which, as it appeals to the conscience and integrity of the members by the same sanctions which apply to judges and jurors who sit in other trials, will commend itself to all persons who deem the highest trusts, rights, and duties worthy of the same protection and security, at least, as those of the humblest order. It would, indeed, be a monstrous anomaly, *137 that the highest officers might be convicted of the worst crimes without any sanction being interposed against the exercise of the most vindictive passions, while the humblest individual has a right to demand an oath of fidelity from those who are his peers and his triors.[33]
This passage is striking for two reasons. First, Story’s early account of the content of the Constitution sheds light on the common understanding of the constitutional right to jury trial at the time, namely that the accused “has a right to demand an oath of fidelity from those who are his peers and his triors.”[34] Second, the fact that our Framers took care to ensure that senators swore an oath before serving in a juratorial capacity is strong textual evidence that the concept of jury trial enshrined in the Constitution necessarily presupposed a sworn jury. Whereas the absence of any mention of an “oath” in the Sixth Amendment is, of course, explained by the fact that it is inherent in the concept and definition of “jury,” the same cannot be said for senators sitting as a court of impeachment; hence, the express inclusion of the oath requirement during the drafting process.
Finally, it bears mentioning that numerous courts have similarly concluded that the oath is part of the constitutional guarantee of trial by jury.[35] In fact, *138 “[w]ith a remarkable degree of consensus, courts across the nation agree that swearing the jury is an integral, essential, fundamental component of a fair trial.”[36] The majority relies on United States v Turrietta[37] for the proposition that no federal court has expressly recognized the Sixth Amendment right to a sworn jury, but its myopic citation ignores the entirety of the Turrietta court’s constitutional analysis.[38] I need not reproduce Turrietta’s constitutional discussion here, but its summary of the constitutional analysis will suffice to show that it supports my conclusion:
In short, the oath is bound up with some of the great principles giving rise to the very concept of a jury trial. With its appeal to divine judgment and its enduring impression on the conscience of the juror, the oath has ‘moved seamlessly’ from medieval modes of decisionmak-ing into the modern courtroom. Its history, together with certain common sense assumptions about the way it works in practice, reveals a strong relationship to the jury’s reliability as a fact finder. Whether the relationship is strong enough to afford the oath constitutional stature is a question we leave unanswered ... ,[39]
*139 My constitutional analysis—rooted in history, original meaning, and a contextual reading of the constitutional text—is entirely consistent with that of federal and state courts that have historically recognized, implicitly and explicitly, the critical role the oath plays in trial by jury.[40]
“Whatever else it may mean in addition, the defendant’s constitutional right [to trial by jury] means, always and everywhere, at least what it explicitly says: the [right to be tried by a ‘jury’] .”[41] And a jury is not a jury until it is sworn. Indeed, to separate the oath from “jury” in the Sixth Amendment would be to disembowel all historical pedigree, etymological heritage, and common law meaning from the word “jury.”[42] For these *140 reasons, I would hold that the Sixth Amendment *141 necessarily guarantees the right to a sworn jury and that the trial court’s failure to properly swear the jury deprived defendant of this constitutional protection.
III. THE CONSTITUTIONAL VIOLATION WAS “PLAIN"
Having established that the error of failing to swear the jury was of constitutional magnitude, I turn now to assess under the second Carines prong whether the error was “plain, i.e., clear or obvious.”[43] Nearly 40 years ago, in Pribble, the Court of Appeals held, “The oath is designed to protect the fundamental right of trial by an impartial jury.”[44] Although it was unaccompanied by any of the relevant constitutional analysis above, Pribble’s holding that failure to swear the jury signals a constitutional deprivation was nonetheless binding precedent on the trial court at the time of defendant’s trial. Therefore, the constitutional error was “plain, i.e., clear or obvious,” and the second Carines prong is satisfied in this case.[45]
IV. THE THIRD CARINES PRONG AND FAILURE TO SWEAR THE JURY AS A STRUCTURAL ERROR
The third prong of the plain error standard requires a defendant to establish that the plain error affected his or her substantial rights, which typically means that it affected the outcome of the lower court proceedings.[46] However, the United States Supreme Court has noted that “certain errors, termed ‘structural errors,’ might ‘affec[t] substantial rights’ regardless of their *142 actual impact on an appellant’s trial.”[47] Structural error—originally a concept of the harmless error standard, applicable to preserved claims of error—is a particular type of constitutional error that is not amenable to harmless error analysis.[48] The concept of structural error is highly relevant under the third prong of the Carines plain error standard because the harmless error standard and third Carines prong are both functionally “the same kind of inquiry.”[49] Because both inquiries examine the effect of the error on the verdict reached in a particular case, it stands to reason that structural errors are likewise not amenable to analysis under the third Carines prong.[50] Defendant argues that failure to swear the jury is a structural error satisfying the third Carines prong. I agree.
Structural errors comprise a small subset of constitutional errors that “affec[t] the framework within which the trial proceeds,” rather than “simply an error *143 in the trial process itself.”[51] Whether an error is “structural” is a function of “the difficulty of assessing the effect of the error.”[52] Whereas structural errors are framework-affecting errors whose consequences are “necessarily unquantifiable and indeterminate,” “trial errors” happen during the presentation of the case and can be “quantitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless beyond a reasonable doubt.”[53] Structural errors “infect the entire trial process” and “necessarily render a trial fundamentally unfair.”[54] They “deprive defendants of‘basic protections’ without which ‘a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . .’ ”[55]
The number of constitutional errors labeled “structural” is quite limited.[56] However, I have little difficulty fitting the failure to properly swear the jury into the constellation of structural errors. The oath is a foundational component of the “framework within which the trial proceeds.”[57] It solemnizes the proceedings at the outset by calling on jurors to make an outward pronouncement that they “will justly decide” the case *144 and “render a true verdict” under the sacred appeal to one’s conscience and integrity that follows from swearing an oath.[58] Its influence pervades the entire proceedings, governing the jury’s evaluation of evidence during trial and deliberations on the question of guilt after the close of proofs. Further, although its historical pedigree as “a ‘natural and universal custom’ ” is evidence of its undeniable influence on people’s conduct,[59] it is difficult, if not impossible, to assess as a general matter what tangible effect the absence of the oath has on verdicts. The influence of the oath on information-processing and judgment functions at a psychological level. Thus, any generalized statements regarding its tangible effect on jurors’ decision-making process and verdict would be purely speculative.[60]
*145 The right to a sworn jury—the jury guaranteed by the Constitution—is a “ ‘basic protectio[n]’ whose precise effects are unmeasurable, but without which a criminal trial cannot reliably serve its function.”[61] As the Supreme Court stated in Sullivan v Louisiana, “The right to trial by jury reflects ... ‘a profound judgment about the way in which law should be enforced and justice administered.’ The deprivation of that right, with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as ‘structural error.’ ”[62] Because the oath is woven into the very fabric of the trial and defies any attempt at quantifying the consequences of its absence as it relates to the jury’s verdict, it is the quintessential structural error.[63]
This Court has stated that our caselaw “suggests” that structural errors satisfy the third Carines prong.[64] In my view, however, logic dictates that they should. If the third Carines prong is functionally “the same kind of inquiry” as harmless error analysis,[65] it stands to reason that errors that defy harmless error analysis are likewise not amenable to the prejudice inquiry required under the third Carines prong. In fact, the United States Supreme Court has described structural errors as those that “affect substantial rights”—the *146 very standard under the third Carines prong.[66]1 would make explicit what is “suggested” in our previous cases and hold that structural errors, like the failure to swear the jury in this case, satisfy the third prong without an additional showing of outcome-determinative prejudice.
V. THE FOURTH CARINES PRONG AND SERIOUS EFFECT ON THE FAIRNESS, INTEGRITY, OR PUBLIC REPUTATION OF JUDICIAL PROCEEDINGS
I come now to where the majority began its analysis: the fourth Carines prong. Once a defendant has established that a “forfeited error is ‘plain’ and ‘affect [s] substantial rights,’ ” an appellate court has discretionary authority to correct the error, but is under no obligation to do so.[67] Because relief on plain error review is in the discretion of the reviewing court, a defendant bears the burden of persuading the court that the error “seriously affect [ed] the fairness, integrity or public reputation of judicial proceedings.”[68]
This area of the law is not a model of clarity, and little has been said on how exactly a defendant goes about carrying his or her burden under the fourth *147 prong, especially when the error is structural.[69] Nevertheless, a basic unarticulated framework can be gleaned from the existing caselaw that, if adopted by a majority of the Court, would provide some order to the analysis in this area of the law.
A. STRUCTURAL ERRORS AND THE FOURTH CARINES PRONG
It is undisputed that “a plain error affecting substantial rights does not, without more, satisfy the [fourth Carines prong], for otherwise the discretion afforded by [the plain error test] would be illusory.”[70] What this means in a typical case involving a garden-variety trial error is that a defendant will have to show more than simply that there is a reasonable probability that the forfeited error affected the outcome of the trial under the third Carines prong. He or she must also make the case for why the court should overlook the preservation requirement and grant relief. That requires the defendant to show that the error resulted in a wrongful conviction or seriously affected the fairness, integrity, or public reputation of the proceedings.
In the context of structural errors, however, the analysis under the third Carines prong is different. Structural errors satisfy the third prong because the type of inquiry that the third prong calls for is simply *148 not possible when dealing with structural errors. But structural errors are structural, not just because their effect on the result is indeterminate, but also because they “necessarily render a trial fundamentally unfair”[71] and, by definition, mean that the “ ‘criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . ”[72] As a result, there is substantial overlap between the characteristics of structural errors (i.e., they “necessarily render a trial fundamentally unfair”) and the standard under the fourth Cannes prong (“serious effect on the fairness, integrity, or public reputation of the proceedings”).[73] As a matter of transitive logic, the fact that the defendant has proved that a particular error is structural should also be sufficient to make the presumptive case that the fairness, integrity, or public reputation of the proceedings has been seriously affected. In short, structural errors carry with them Olano’s something “more” that is required to establish the fourth prong.[74]
*149 This recognition of how structural error analysis relates to the fourth Carines prong yields an approach to unpreserved structural errors that clarifies and better harmonizes the caselaw in this area, both in theory and in practice.[75] In theory, the existence of a structural error—whose effect on the trial is unquantifiable and indeterminate—is incompatible with the requirement that a defendant identify specific facts on the record showing that the error seriously affected the fairness, integrity, or public reputation of the proceedings. The only way to resolve this apparent incongruity is to recognize that a structural error provides a rebuttable presumption that the fairness of the proceedings was seriously affected, while still allowing the prosecution to identify aspects of the trial record that show that the fairness, integrity, or public reputation of the proceedings were, in fact, not seriously affected despite the structural error. This framework recognizes the undeniable effect a structural error has on the inquiry under the fourth Carines prong while still retaining the fact-specific, discretionary characteristics of that final prong.[76] It also recognizes the reality that in our *150 adversarial system it is the prosecution that must offer parts of the record as mitigating the damage caused by a structural error, as occurred in this case.
In practice, this formulation of the fourth prong analysis is nothing new. Rather, I believe it accurately describes how courts have been applying the plain error standard to structural errors all along. In cases in which a court affirms a conviction despite a structural error, the court conducts a fact-intensive, case-specific inquiry to conclude that the error did not seriously affect the fairness, integrity, and public reputation. Most notably, this is how the Court decided People v Vaughn.[77] In Vaughn, the Court acknowledged that the closure of the courtroom constituted structural error, but proceeded to examine the record to identify several aspects of the proceedings that indicated that the fairness, integrity, and public reputation of the proceedings were not, in fact, seriously affected.[78] Likewise, in Johnson v United States, the Supreme Court addressed the failure to instruct on an element of a charged offense and the defendant’s argument that the error was structural.[79] After assum *151 ing that the third prong was satisfied, the Court reviewed the record before concluding that the evidence pertaining to the disputed element was overwhelming and, therefore, that the fairness, integrity, and public reputation of the proceedings were not seriously affected.[80]
These cases are entirely consistent with the approach laid out in this opinion, which presumes that the fairness of the trial proceedings is seriously affected, but allows the prosecution to identify elements in the record that mitigate or rebut the notion— inherent in the very occurrence of a structural error— that the error seriously affected the fairness, integrity, or public reputation of the proceedings.
On the other hand, when courts reverse on the basis of an unpreserved structural error, they rarely, if ever, discuss additional facts on the record independently of the structural error analysis to establish that the fairness and integrity of the proceedings were seriously affected. Instead, the courts simply reiterate the same basic points made during the structural error analysis. The Court of Appeals decision at the center of this case, People v Allan,[81] is a prime example. In explaining why the structural error of failing to swear the jury satisfied the fourth Carines prong, the Allan panel reasoned:
[T]he trial court’s failure to administer the oath to the jury seriously affected the fairness, integrity, and public reputation of the judicial proceedings. Because the trial court did not administer the oath to the jury, the jury did not undertake the solemn promise to act in accordance with the law at all stages of defendant’s trial. The trial court’s *152 failure to administer the oath to the jury in this case affected the integrity of the proceedings because it resulted in an invalid verdict under Michigan law. The absence of the oath deprived defendant of a means to ensure that the jury would decide the case honestly in accordance with the law and on the basis of the evidence. Administration of the oath was necessary to protect defendant’s fundamental right to a trial by an impartial jury.1[82]1
Allan is not alone. For instance, in United States v Floresca, the United States Court of Appeals for the Fourth Circuit approached the fourth prong analysis by stating:
To begin with, we note that we must once again leave unfulfilled the desire, born of reflex and not of contemplation, to inject a prejudice component into our analysis. Such a consideration may be appropriate and weigh in a defendant’s favor in a case where he is required to demonstrate actual prejudice in order to satisfy the third prong—and succeeds in doing so. However, in a case like Ploresca’s, where the error amounts to a structural defect that renders irrelevant, ab initio, the question of prejudice, logic requires us to instead focus on the nature of the error itself.1[83]1
The court in Floresca ultimately exercised its discretion to reverse the defendant’s convictions, and in doing so never identified any additional, specific facts on the record establishing the fourth prong. Instead, reasoning in the abstract about the effect the structural error has on proceedings generally, the panel simply concluded: “We do not hesitate to say that convicting a defendant of an unindicted crime affects the fairness, integrity, and public reputation of federal *153 judicial proceedings in a manner most serious.”[84]
Allan and cases like it illustrate one simple fact: structural errors, by their nature, seriously affect the fairness and integrity of the proceedings. It may not be so in every case, which is why courts must examine the record for “countervailing factors” to assess whether anything mitigates the serious unfairness typically brought on by a structural error.[85] But when review of the record turns up nothing, the end result of the analysis is simply a reiteration of the structural error analysis.[86]
To be clear, the foregoing does not mean that structural errors automatically, necessarily, or always satisfy the fourth Carines prong.[87] This Court has been *154 clear that they do not.[88] But it is another question altogether how a defendant goes about satisfying the initial burden of persuading the court that the fairness and integrity of the proceedings have been seriously affected. Nothing in law or logic dictates that we must treat the third and fourth Carines prongs as separate silos. In fact, it betrays the plain error analysis to disregard the preliminary conclusion that an error is structural when assessing whether it seriously affected the fairness, integrity, or public reputation of the proceedings. Because, by definition, structural errors “necessarily render a trial fundamentally unfair,”[89] common sense dictates that by establishing a structural error, a defendant makes a presumptive case for serious unfairness and lack of integrity in the proceedings.
But the case is just that: presumptive. The prosecution then has the opportunity, as it always has, to identify parts of the record showing that, in fact, the fairness, integrity, and public reputation of the proceedings were not seriously affected. In some cases, the court will find instances in the record that mitigate the *155 unfairness and unreliability that presumptively flow from a structural error—after all, not all structural errors are created equal, and even the same structural error can be committed in a variety of different ways. In others, however, the record will turn up nothing of tangible benefit. But this does not mean that the fairness and integrity of the proceeding were not seriously affected—after all, that characteristic is inherent in the very nature of structural error. In that case, defendant will have satisfied the burden under the fourth Carines prong by proving the existence of a structural error.
B. APPLICATION OF THE FOURTH CAMINES PRONG
The foregoing is entirely consistent with the basic mode of analysis in the majority opinion today. Agreeing with the points made by the prosecution on appeal, the majority identifies several aspects of the trial record that, in its view, show that the underlying purposes of the juror’s oath were otherwise satisfied and, therefore, that the absence of the oath did not seriously affect the fairness, integrity, or public reputation of the judicial proceedings in this case. By approaching the question from the negative to conclude that relief is not warranted, it is perfectly consistent with the approach I have outlined above.
I also agree with the majority that our decision in Vaughn is instructive, though I believe it provides weak support for the majority’s conclusion in this case. In Vaughn, the Court relied on three countervailing considerations to hold that the fourth Carines prong was not satisfied: the closure of the courtroom was temporary, it was not complete in that the venire members were present, and both sides expressed sat *156 isfaction with the end result of voir dire.[90] None of these considerations is present in this case. The error in this case infected the entire trial, from its inception through jury deliberations. Thus, unlike the structural error in Vaughn, focusing on the duration and extent of the error in this case provides no support for the conclusion that it did not seriously affect the fairness, integrity, or public reputation of the proceedings. Also, unlike in Vaughn, defendant has challenged the end result, i.e., the jury’s verdict, on multiple grounds. In short, this case features none of the countervailing factors that the Court in Vaughn relied on to hold that the fairness, integrity, and public reputation of the proceedings were not seriously affected.
Moreover, I disagree with the majority that the aspects of the record it identifies are sufficient to show that the fairness, integrity, and public reputation of the proceedings were not seriously affected. The majority holds that one of the primary purposes of the oath—to convey to the jury members their responsibility as jurors—was satisfied by the trial court’s preliminary instructions. The majority’s reliance on the trial court’s instructions is misplaced and actually serves to illustrate just how fundamental the oath is to the fairness and integrity of the proceedings. The instructions are meaningful substitutes only if we presume that jurors follow their instructions. The law does make such a presumption, but only because jurors have taken an oath to do so.[91] When the oath is not given, like in this case, that presumption cannot obtain. The trial court’s *157 instructions here prove nothing because their efficacy is based on an oath that was never taken.
The other trial feature that, according to the majority, compensated for the oath’s absence was the fact that the potential jurors stated under oath during voir dire that they could be fair and impartial. Again, I agree with the majority’s general method of assessing the record. But having previously determined that the error in this case was structural, I start from the premise that the absence of the juror’s oath rendered the proceedings fundamentally unfair. From this perspective, I disagree that statements given under oath regarding a juror’s ability to be fair and impartial provide sufficient support for the conclusion that the fairness, integrity, or public reputation of the proceedings were not seriously affected in this case.
Promising to be fair and impartial is only one component of the juror’s oath. The juror’s oath also calls on prospective jurors to render a “true verdict” and to decide the case based solely on the evidence introduced at trial and the law as it is given to them by the trial court.[92] Indeed, the trier of fact guaranteed by the Constitution is one “capable and willing to decide the case solely on the evidence before it.”[93] Although the trial court and the attorneys discussed these concepts during voir dire, my review of the record shows that only three of the jurors who ultimately deliberated over defendant’s guilt were asked and answered questions about whether they could consider only the evidence presented in court and the law as it was given *158 to them by the court. The remaining nine jurors gave no indication of their willingness and ability to decide the case based solely on the evidence and law as it was given to them. Thus, a review of the record for evidence that the jurors were willing and able to assume each obligation of the juror’s oath—a consideration I agree is relevant to whether the fairness, integrity, or public reputation of the proceedings was seriously affected— shows that it was lacking in this case.
Admittedly, the inquiry under the fourth Carines prong is difficult. But where I differ from the majority is in my assessment of the record as it relates to the negative consequences flowing from the structural error in this case. The right to a sworn jury is a “ ‘basic protectio[n]’.. . without which a criminal trial cannot reliably serve its function [.]”[94] As it relates to the fourth prong analysis, the oath shapes the fairness, integrity, and public reputation of the proceedings in two significant ways. First, it enhances the fairness of the proceedings by assuring the defendant that his or her fate will be decided by jurors who, on their consciences, will decide the case fairly in accordance with the law and evidence. Likewise, it enhances the integrity and reputation of the proceedings by assuring the public that jurors will follow and apply the law as it is given to them, even if they harbor personal disagreements with the law generally. The oath’s complete absence diminishes the fairness, integrity, and public reputation of the proceedings. Unless there are other indicia on the record to show that these assurances were otherwise made, reversal is required under the fourth Carines prong because failure to swear the jury, as a structural error, renders the proceedings fundamentally unfair.[95]
*159 Lacking in this case is a sufficient indication on the record that the jury was, from the perspective of the defendant and the public, a reliable vehicle by which to judge defendant’s guilt or innocence. I agree with the majority that the record in a given case could, nonetheless, contain evidence that the jurors, in fact, undertook and followed the obligations that would be imposed by the oath. However, statements by jurors touching on only one aspect of the juror’s oath, though given under oath, are insufficient to show that the failure to swear the jury did not seriously affect the fairness, integrity, or public reputation of the proceedings.
Nor is it sufficient to say, “Although the court clerk indisputably read the wrong oath to the jury, the jury was nevertheless sworn.”[96] The oath given in this case—the voir dire oath—is an “assertory oath” that called on the jurors to “attest [] to some factual matter” (i.e., their qualifications as jurors).[97] The oath that was omitted—the juror’s oath—is, by contrast, a “promissory oath” that obliges the swearer to “observe a specified course of conduct in the future” (i.e., to decide the case fairly and in accordance with the law and evidence).[98] I disagree that the jury members in this case were “sworn” in any meaningful sense pertaining to their duties as jurors because the oath they took did not invoke any of the promises contained in the juror’s oath. A jury becomes a jury when its members take the juror’s oath—not just any old oath.[99] A criminal defendant has the right to assurance that those selected to *160 decide his or her fate fairly in accordance with the law and evidence will carry out that task under the solemn obligation of an oath.
In this case, a majority of defendant’s jury did not otherwise expressly assume the solemn obligations imposed by the juror’s oath. Without this additional support in the record, I am persuaded that the trial court’s failure to administer the juror’s oath, which deprived defendant of the jury guaranteed to him by the Constitution, seriously affected the fairness, integrity, and public reputation of the proceedings in this case. I would therefore hold that reversal is warranted under the fourth Carines prong.
VI. CONCLUSION
Nothing in this opinion is intended to, or should, diminish the hard work and dedication of those who served as jurors in this case, and who, by all outward appearances, conducted themselves in an appropriate manner throughout the trial. Rather, the origin of this error lies with the trial judge, who failed to perform one of the more routine tasks required in the conduct of a trial. Nor do I take lightly the social costs to the victims’ families and others involved in the trial or the public expense associated with a new trial. However, I cannot ignore the cost to society of diminishing the importance of the juror’s oath and the harmful consequences that will follow from the subtle undermining of the right trial by jury reflected in today’s majority opinion. “Formal requirements are often scorned when they stand in the way of expediency. This Court, however, has an obligation to take a longer view.”[100]
*161 Appellate courts may no longer be “impregnable citadels of technicality,”[101] but swearing the jury is no technicality; it goes to the heart of trial by jury and is a key component to a fundamentally fair trial. For that reason, I respectfully dissent.
McCormack, J., concurred with Viviano, J.

 4 Blackstone, Commentaries on the Laws of England, p *350.

 People v Cannes, 460 Mich 750, 763; 597 NW2d 130 (1999).

 Id.

 Id.

 Id. (quotation marks and citation omitted; first alteration in original).

 The majority’s reference to the constitutional avoidance doctrine to justify skipping over the first three prongs of the plain error test in this case is misplaced. Ante at 117 n 4. As explained below, the fact that an error is constitutional and structural has an undeniable effect on the analysis under the fourth Cannes prong. This important nuance in the legal analysis is lost by avoiding the first three prongs simply because the ultimate result might be the same. More importantly, when the constitutional analysis would yield a different, more favorable result for the defendant, as I find it does in this case, the constitutional avoidance doctrine has no application.

 See MCR 2.511(H)(1); MCL 768.14.

 People v Allan, 299 Mich App 205; 829 NW2d 319 (2013).

 Id. at 211, 213-215.

 People v Pribble, 72 Mich App 219, 224; 249 NW2d 363 (1976).

 In the one United States Supreme Court decision that even remotely dealt with the issue of unsworn jurors, Baldwin v Kansas, 129 US 52, 56; 9 S Ct 193; 32 L Ed 640 (1889), the Court found that “no Federal question is presented ... of which this court can take jurisdiction” because the defendant had failed to properly preserve the claim of error at trial, as required by a federal statute in effect at that time.

 US Const, Am VI; see also Duncan v Louisiana, 391 US 145; 88 S Ct 1444; 20 L Ed 2d 491(1968) (incorporating the Sixth Amendment right to jury trial against the states under the Fourteenth Amendment); see also Const 1963, art 1, § 20.

 Boumediene v Bush, 553 US 723, 843; 128 S Ct 2229; 171 L Ed 2d 41 (2008) (Scalia, J., dissenting), citing Crawford v Washington, 541 US 36, 54; 124 S Ct 1354; 158 L Ed 2d 177 (2004).

 See, e.g., Gibbons v Ogden, 22 US (9 Wheat) 1,188; 6 L Ed 23 (1824) (“[T]he enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said.”).

 Dist of Columbia v Heller, 554 US 570, 576; 128 S Ct 2783; 171 L Ed 2d 637 (2008) (quotation marks and citation omitted).

 Smith v Alabama, 124 US 465, 478; 8 S Ct 564; 31 L Ed 508 (1888).

 Apprendi v New Jersey, 530 US 466, 477; 120 S Ct 2348; 147 L Ed 2d 435 (2000) (“[T]he historical foundation for our recognition of [the constitutional protections of the Sixth Amendment] extends down centuries into the common law.”); Gannett Co, Inc v DePasquale, 443 US 368, 385; 99 S Ct 2898; 61 L Ed 2d 608 (1979) (“The common-law right to a jury trial... is explicitly embodied in the Sixth .. . Amendment!].”).

 Silving, The Oath: I, 68 Yale L J 1329, 1330 (1959) (“The familiar oath of the present-day courtroom has been traced to a pre-religious, indeed, pre-animistic period of culture.”); see also, generally, White, Oaths in Judicial Proceedings and Their Effect upon the Competency of Witnesses, 51 Am L Reg 373 (1903).

 Oaths in Judicial Proceedings, 51 Am L Reg at 386.

 The Oath: I, 68 Yale L J at 1365; see also Thayer, “Law and Fact” in Jury Trials, 4 Harv L Rev 147,156-157 (1890) (describing the emergence of trial by jury and stating that “it was the jury’s oath, or rather their verdict, that ‘tried’ the case”).

 3 Blackstone, p *365 (emphasis added; first italics in original).

 The Oath: I, 68 Yale L J at 1361 (“Even that distinctive English feature—the jury trial—grew out of Germanic oath practices.”); 1 Pollock & Maitland, The History of English Law (2d ed) (Cambridge: Oxford University Press, 1968), bk I, ch VI, p 138 (“The essence of the jury... seems to be this: a body of neighbors is summoned by some public officer to give upon oath a true answer to some question.”) (emphasis added); Forsythe, History of Trial by Jury (2d ed) (Jersey City: Frederick D. Linn & Company, 1875), pp 6-7 (“One important feature of the institution is by no means peculiar to it. I mean the fact that it is a sworn tribunal—that its members decide under the solemn sanction of an oath.”).

 The Oxford Dictionary of English Etymology (1974), p 500; Cassell’s Latin Dictionary (1968), pp 331, 846 (rendering it as “iurare”); 1 Heath’s Standard French and English Dictionary: French—English (London: D.C. Heath & Company, 1963), p 478. And the more distant etymological associates of “jury” include “jurat,” which means “[a] person under oath,” 9 The Anglo-American Encyclopedia and Dictionary (New York: J. A. Hill & Company, 1904), p 2417, and “juratory,” which means “comprising an oath,” Samuel Johnson, A Dictionary of the English Language (1785).

 Thayer, The Jury and Its Development, 5 Harv L Rev 249, 259 (1892).

 2 Bouvier’s Law Dictionary (Rawle’s rev, 1897), p 56 (emphasis added).

 Samuel Johnson, A Dictionary of the English Language (1785) (emphasis added); see also Bailey, An Universal Etymological English Dictionary (20th ed, 1763) (defining “jury” as “[in Common Law] a Company of twenty-four or twelve Men, sworn to inquire of the Matter of Fact, and declare the Truth upon such evidence as shall be given to them, relating to the Matter of Fact”) (bracketing in original; emphasis added); Potts, A Compendious Law Dictionary (1803), p 406 (defining “jury” as “a certain number of persons sworn to enquire of and try some matter of fact, and to declare the truth upon such evidence as shall be laid before them”) (emphasis added).

 See, e.g., Random House Webster’s College Dictionary (2001) (defining “jury” as “a group of persons sworn to render a verdict or true answer on a question or questions submitted to them, esp. such a group selected by law and sworn to examine the evidence in a case and render a verdict to a court”) (emphasis added); The Oxford Dictionary of English Etymology (1974) (“[A] company of men sworn to give a verdict.”) (emphasis added); Black’s Law Dictionary (4th ed) (“A certain number of men, selected according to law, and sworn (jurati) to inquire of certain matters of fact, and declare the truth upon evidence to be laid before them.”); Funk and Wagnalls Practical Standard Dictionary of the English Language (Chicago: J. G. Ferguson & Associates, 1945), p 628 (“A body of persons (usually twelve) legally qualified and summoned to serve on a judicial tribunal, there sworn to try well and truly a cause and give a true verdict according to the evidence.”) (emphasis added).

 Indeed, oaths are so integral to the concept of a jury that, in common parlance, one who refuses to take a required oath is deemed a “nonjuror.” See Merriam-Webster’s Collegiate Dictionary (2014).

 See Amar, Sixth Amendment First Principles, 84 Geo L J 641, 694 (1996) (stating that in the Framers’ world, “great weight was placed on oaths”). Indeed, the very first statute enacted by Congress assembled under the Constitution was titled, “An Act to regulate the Time and Manner of administering certain Oaths.” 1 Cong Ch 1; 1 Stat 23.

 See US Const, art I, § 3, cl 6.

 2 Farrand, The Records of the Federal Convention of 1787 (1937 rev ed) (New Haven: Yale University Press, 1966), p 497.

 See id. at 552-553.

 1 Story, Commentaries on the Constitution of the United States (4th ed) (Boston: Little, Brown, & Company, 1873), p 549 (originally published in 1833) (emphasis added).

 Id.

 See, e.g., State v Barone, 329 Or 210, 226; 986 P2d 5 (1999) (“The jury oath is designed to vindicate a defendant’s fundamental constitutional rights to a fair trial before an impartial jury.”); State v Godfrey, 136 Ariz 471, 473; 666 P2d 1080 (Ariz App, 1983) (“[T]he juror’s oath is an essential element of the constitutional guarantee to a trial by an ‘impartial’ jury.”); Steele v State, 446 NE2d 353, 354 (Ind App, 1983) (“Most importantly the oath serves as a safeguard of a criminal defendant’s fundamental constitutional right to trial by an impartial *138 jury.”); Commonwealth v Banmiller, 393 Pa 496, 497; 143 A2d 56 (1958) (swearing of the jury is “fundamental in nature, and implicit in trial by jury”); Howard v State, 80 Tex Crim 588, 592; 192 SW 770 (1917) (“[The defendant tried by an unsworn jury] was deprived of a constitutional as well as a statutory right.”); Slaughter v State, 100 Ga 323, 330; 28 SE 159 (1897) (“[A] conviction by an unsworn jury is a mere nullity .. ..”); see also 47 Am Jur 2d, Jury, § 192, pp 803-804; 50A CJS, Juries, § 520, p 689.

 State v Arellano, 1998-NMSC-026, ¶ 41; 125 NM 709, 718; 965 P2d 293 (1998) (McKinnon, J., dissenting) (citing numerous examples).

 United States v Turrietta, 396 F3d 972, 982 (CA 10, 2012).

 See id. at 978-981.

 Id. at 981 (citation omitted). Turrietta was ultimately decided on grounds distinguishable from the present case. The panel held that even if it was a constitutional error, it was not “plain” under the governing authority at the time. Id. at 983. Here, however, the error was plain in *139 light of the Court of Appeals’ holding in Pribble. The Turrietta court also declined to grant relief under the fourth plain error prong because defense counsel had admitted that he knew about the error and waited until an unfavorable verdict to bring it to the court’s attention. Id. at 973-974. That was textbook “sandbagging,” which, as Turrietta observed, imperils the integrity of the judicial system just the same as the error itself. Id. at 985. There is no such evidence in this case.

 See cases cited in note 35 of this opinion; Turrietta, 696 F3d at 978-981; United States v Martin, 740 F2d 1352, 1358-1359 (CA 6, 1984) (questioning whether swearing of prospective jurors en masse was “consistent with the dignity and effectiveness which should attend federal court trials” and stating that “the defendant should be accorded the assurance that the jurors have been sworn to try his case by observing them sworn”) (quotation marks and citation omitted).

 See Maryland v Craig, 497 US 836, 862; 110 S Ct 3157; 111 L Ed 2d 666 (1990) (Scalia, J., dissenting) (discussing the Sixth Amendment right of confrontation).

 Of course, not every question of constitutional interpretation will fall squarely within the text of a particular provision. Oftentimes, a court will be called on to apply a constitutional phrase, like “trial by jury,” to factual situations approaching the outer bounds of the language’s plain meaning. For instance, in Williams v Florida, 399 US 78; 90 S Ct 1893; 26 L Ed 2d 446 (1970), the Supreme Court addressed whether the Sixth Amendment guaranteed a 12-person jury. After concluding that the text, as informed by its common law heritage, was *140 insufficient to answer the question, see id. at 89 (the 12-person size “appears to have been a historical accident”), the Court examined “the function that the particular feature performs and its relation to the purposes of the jury trial,” id. at 99-100. However, unlike jury size— whose origins “rest on little more than mystical or superstitious insights” and which fluctuated over time, see id. at 87-88—the juror’s oath represents a fixed constant in the development of the jury trial to the point that it inheres in the very word “jury.” When an error constitutes a literal deprivation of a constitutional right, it is generally unnecessary to “abstracto from the right to its purposes . ...” Craig, 497 US at 862 (Scalia, J., dissenting). The genetic relationship between the oath and the jury distinguishes it from the size of the jury and Williams’s functional approach.
Even if Williams’s functional approach governed, I would have no difficulty concluding that the oath serves an indispensable function in service of the greater purposes of the constitutional right to a jury trial. To fulfill their role, jurors must “have the duty’ to deliberate. Apodaca v Oregon, 406 US 404, 410-411; 92 S Ct 1628; 32 L Ed 2d 184 (1972) (stating that the purpose of the jury trial is fulfilled “as long as [the jury] consists of a group of laymen representative of a cross section of the community who have the duty and the opportunity to deliberate, free from outside attempts at intimidation, on the question of a defendant’s guilt”) (emphasis added). And the oath imposes that duty. Without it, those acting as jurors serve without solemn obligation or sanction, and the essential purpose of the jury trial is left unfulfilled. 2 Story, Commentaries, p 541 (stating that the core function of trial by jury cannot be achieved but “by the firm and impartial verdict of a jury sworn to do right, and guided solely by legal evidence and a sense of duty”). Moreover, the oath’s directive to conscientiously deliberate and examine the evidence impartially counters the threats of complacency and overzealousness that are more apt to be found in a single, professional arbiter or prosecutor, the two evils the jury was intended to ward off. See Williams, 399 US at 100 (the purpose of the jury is “to prevent oppression by the Government” by providing a defendant “an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge”) (quotations omitted). Finally, the oath serves as the very benchmark for determining whether a defendant was afforded an impartial jury, as guaranteed by the Sixth Amendment. See Wainwright v Witt, 469 US 412, 423; 105 S Ct 844; 83 L Ed 2d 841 (1985) (stating that an impartial jury consists of nothing more than “jurors who will conscientiously apply the law and find the facts”). In sum, under the Williams functional approach, the oath serves an indispensable role in the constitutional right to a jury trial.

 Carines, 460 Mich at 763.

 Pribble, 72 Mich App at 224.

 See United States v DeChristopher, 695 F3d 1082, 1091 (CA 10, 2012) (stating that an error is plain if there is binding circuit precedent on point); Carines, 460 Mich at 763.

 Carines, 460 Mich at 763.

 United States v Marcus, 560 US 258, 263; 130 S Ct 2159; 176 L Ed 2d 1012 (2010) (alteration in original); see also People v Vaughn, 491 Mich 642, 666; 821 NW2d 288 (2012) (“[0]ur caselaw suggests that a plain structural error satisfies the third Carines prong.”), citing People v Duncan, 462 Mich 47, 51; 610 NW2d 551 (2000) (“Structural errors . .. are intrinsically harmful, without regard to their effect on the outcome . . . .”).

 Arizona v Fulminante, 499 US 279, 309-310; 111 S Ct 1246; 113 L Ed 2d 302 (1991).

 United States v Olano, 507 US 725, 734; 113 S Ct 1770; 123 L Ed 2d 508 (1993).

 Compare People v Grant, 445 Mich 535, 553; 520 NW2d 123 (1994) (“[T]he proper interpretation of the term ‘prejudice’ in the context of issue preservation for plain error may be equated with the longstanding state precedent of outcome determination.”), with Neder v United States, 527 US 1, 7; 119 S Ct 1827; 144 L Ed 2d 35 (1999) (“Errors of this type [structural errors] are so intrinsically harmful as to require automatic reversal (¿.e., ‘affect substantial rights’) without regard to their effect on the outcome.”).

 United States v Gonzalez-Lopez, 548 US 140, 148; 126 S Ct 2557; 165 L Ed 2d 409 (2006) (quotation marks and citation omitted) (alteration in original).

 Id. at 149 n 4.

 Id. at 148, 150 (quotation marks and citations omitted) (alteration in original).

 Neder, 527 US at 8 (quotation marks and citations omitted).

 Id. at 8-9, quoting Rose v Clark, 478 US 570, 577-578; 106 S Ct 3101; 92 L Ed 2d 460 (1986).

 Johnson v United States, 520 US 461, 468-469; 117 S Ct 1544; 137 L Ed 2d 718 (1997) (stating that “[w]e have found structural errors only in a very limited class of cases” and listing cases).

 Gonzalez-Lopez, 548 US at 148.

 MCR 2.511(H)(1).

 Milhizer, So Help Me Allah: An Historical and Prudential Analysis of Oaths as Applied to the Current Controversy of the Bible and Quran in Oath Practices in America, 70 Ohio St L J 1, 4 (2009) (citation omitted); see also Farid, Oath and Affirmation in the Court: Thoughts on the Power of a Sworn Promise, 40 New Eng L Rev 555, 557 (2006) (“[T]hat the oath implicates the motivations it does, that it is in fact so compelling, is indicative of its distinctive stature in our legal system. Nothing, it seems, is as effective in helping to ascertain the truth in the courtroom.”).

 See Gonzalez-Lopez, 548 US at 150 (“Harmless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe.”). Though this does not appear to have deterred scholars from researching this concept. See St. Eve, Burns & Zuckerman, More From the #Jury Box: The Latest on Juries and Social Media, 12 Duke L & Tech Rev 64, 89-90 (2014) (“It is thus not surprising that many jurors in the informal survey referenced their oaths as the reason they did not communicate about the case on social media. Staying true to their oath was personal—a source of ‘pride’ for one, a ‘civic duty’ for another, and a matter of ‘respect’ for several others.”) (citation omitted). In any event, in so far as this information could generally be available in evidentiary form from the jurors themselves, the law precludes such inquiries. People v Budzyn, *145 456 Mich 77, 91; 566 NW2d 229 (1997) (stating that jurors may not impeach their own verdict by subsequent allegations of misconduct relating to the jury’s deliberative process).

 Sullivan v Louisiana, 508 US 275, 281; 113 S Ct 2078; 124 L Ed 2d 182 (1993), quoting Rose, 478 US at 577 (alteration in original).

 Sullivan, 508 US at 281-282 (citation omitted).

 See Gonzalez-Lopez, 548 US at 150.

 Vaughn, 491 Mich at 666 (“Accordingly, our caselaw suggests that a plain structural error satisfies the third Carines prong.”).

 Olano, 507 US at 734.

 See Neder, 527 US at 7 (“Errors of this type [structural errors] are so intrinsically harmful as to require automatic reversal (i.e., ‘affect substantial rights’) without regard to their effect on the outcome.”); Marcus, 560 US at 263.

 Olano, 507 US at 735 (alteration in original).

 United States v Vonn, 535 US 55, 63; 122 S Ct 1043; 152 L Ed 2d 90 (2002) (quotation marks and citations omitted) (alteration in original); see also Vaughn, 491 Mich at 666. Contrary to the majority, there is nothing “incompatible” with holding that the juror’s oath is an indispensable feature of the right to trial by jury and requiring a defendant to show plain error. Ante at 117 n 4. The majority’s assertion conflates two distinct stages in the appellate decision-making process: determining whether an error occurred and determining whether the error warrants relief.

 I am not the first to recognize that this area of the law is in need of some clarity. See Marcus, 560 US at 270-271 (Stevens, J., dissenting) (“This Court’s ever more intensive efforts to rationalize plain-error review may have been bom of a worthy instinct. But they have trapped the appellate courts in an analytic maze that, I have increasingly come to believe, is more liable to frustrate than to facilitate sound decision-making.”); United States v Robinson, 485 US 25, 36; 108 S Ct 864; 99 L Ed 2d 23 (1988) (Blackmun, J., concurring in part and dissenting in part) (observing the “confusion reflected in the Court of Appeals’ application of the plain-error standard”).

 Olano, 507 US at 737 (emphasis added).

 Neder, 527 US at 8 (quotation marks and citation omitted).

 Id. at 8-9, quoting Rose, 478 US at 577-578; see also United States v Dominguez Benitez, 542 US 74, 81; 124 S Ct 2333; 159 L Ed 2d 157 (2004) (characterizing structural errors as those that “undermin[e] the fairness of a criminal proceeding as a whole”).

 See Berger, Moving Toward Law: Refocusing the Federal Courts’ Plain Error Doctrine in Criminal Cases, 67 U Miami L Rev 521, 544 (2013) (“[T]he third and fourth prongs of the Olano inquiry both require the same kind of judgment—an evaluation of whether the error had sufficiently serious consequences to merit reversal—but the fourth prong merely requires a higher level of seriousness.”); Graham, Abuse of Discretion, Reversible Error, Harmless Error, Plain Error, Structural Error; A New Paradigm for Criminal Cases, 43 Crim L Bull, 955, 971 (2007) (“In short, prong three and prong four are, in spite of the protestations in Olano to the contrary, in practice coterminous.”).

 Olano, 507 US at 737 (“[A] plain error affecting substantial rights does not, without more, satisfy the [fourth prong], for otherwise the discretion afforded by [the plain error test] would be illusory.”) (emphasis added).

 It is also creates some symmetry with the hierarchy of how we treat preserved errors. In that realm, we require the defendant to prove harmfulness unless it is a constitutional claim, in which case we require the prosecution to establish harmlessness. See Carines, 460 Mich at 774. And when it is structural constitutional error, we grant automatic reversal. Duncan, 462 Mich at 51. If my thesis is correct, a similar hierarchy exists for unpreserved errors, requiring the proponent of an error to establish that relief is warranted under the fourth Cannes prong for all errors except constitutional, structural errors. In those cases, the structural nature of the error presumptively establishes the fourth prong, shifting the burden to the prosecution to show that, in fact, the fairness, integrity, and public reputation of the proceeding were not seriously affected.

 It is also consistent with the observations made by the United States Court of Appeals for the Ninth Circuit that “structural error is particularly likely to satisfy Olano’s fourth prong.” United States v *150 Recio, 371 F3d 1093, 1103 n 7 (CA 9, 2004); see also United States v Rodriguez, 406 F3d 1261, 1266 (CA 11, 2005) (Carnes, J., concurring in denial of rehearing en banc) (“So far as can be discovered, no court has ever actually held that an error is structural but fails to meet the fourth prong of the plain error test.”).

 Vaughn, 491 Mich 642.

 Id. at 668-669. The majority is wrong to claim that my approach to plain error review of structural errors is inconsistent with Vaughn. Ante at 117 n 4. After recognizing the presence of a structural error, Vaughn proceeded to identify features of the trial proceedings showing that despite the structural error, the fairness, integrity, and public reputation of the proceedings were not seriously affected. Vaughn, 491 Mich at 668-669. This is entirely consistent with the framework set forth in this opinion.

 Johnson, 520 US at 467-468.

 Id. at 470; see also United States v Cotton, 535 US 625, 632-633; 122 S Ct 1781; 152 L Ed 2d 860 (2002) (employing same method).

 Allan, 299 Mich App 205.

 Id. at 218 (citations omitted).

 United States v Floresca, 38 F3d 706, 713 (CA 4, 1994).

 Id. at 714. For other examples of the Allan approach, see United States v Ramirez-Castillo, 748 F3d 205, 217 (CA 4,2014) (“In the instant case, we will exercise our discretion to notice the plain error because failure to do so would seriously affect the fairness, integrity, or public reputation of the judiciary. The Sixth Amendment’s jury trial guarantee, which includes, ‘as its most important element, the right to have the jury, rather than the judge, reach the requisite finding of “guilty,” ’ is fundamental. Sullivan, 508 U.S. at 277, 113 S.Ct. 2078.”); Recio, 371 F3d at 1103.

 See Puckett v United States, 556 US 129, 142-143; 129 S Ct 1423; 173 L Ed 2d 266 (2009) (“It is true enough that when the Government reneges on a plea deal, the integrity of the system may be called into question, but there may well be countervailing factors in particular cases.”).

 See, e.g., Recio, 371 F3d at 1103 (“As noted above, a finding by this court that there is sufficient evidence for a rational jury to conclude that the appellants joined the conspiracy post-seizure would deny appellants their right to have a jury decide this question. Having carefully reviewed the record, we also cannot say that the evidence against Jimenez Recio and Lopez-Meza was ‘overwhelming.’ The fourth Olano prong is satisfied and we exercise our discretion to remand for a new trial.”) (citations omitted).

 Because unpreserved structural errors do not automatically require reversal, nothing in this distillation does violence to the interest of issue preservation. Cf. Rahn v Hawkins, 464 F3d 813, 820 (CA 8, 2006) (“[W]e *154 do not wish to create incentives for parties to delay pointing out manifest errors to a district court. Were we to reverse, parties would have an incentive to ‘sandbag1 a trial court, knowing that they could obtain a new trial if things did not go their way on the merits.”). This articulation of the plain error standard does not tolerate, let alone encourage, sandbagging, nor does it eliminate any incentive to object to structural errors. The prosecution is free to direct the court’s attention to “harboring error,” a fact that will invariably sound the death knell for a defendant’s case for reversal. Moreover, courts will still independently assess the record to determine whether or not the structural error, in fact, seriously affected the fairness integrity or public reputation of the proceedings in a given case. Thus, defendants forfeit errors at their peril.

 Vaughn, 491 Mich at 666-667 (“Although denial of the right to a public trial is a structural error, it is still subject to this requirement.”).

 Neder, 527 US at 8 (quotation marks and citation omitted).

 Vaughn, 491 Mich at 667.

 United States v Powell, 469 US 57, 66; 105 S Ct 471; 83 L Ed 2d 461 (1984) (“Jurors, of course, take an oath to follow the law as charged, and they are expected to follow it.”); United States v Padilla, 639 F3d 892, 897 (CA 9, 2011) (“The significance of the sworn jury is well established. When a jury is sworn, it is entrusted with the obligation to apply the law, *157 and we in turn presume that juries follow instructions given to them throughout the course of the trial.”).

 MCR 2.511(H)(1).

 McDonough Power Equip, Inc v Greenwood, 464 US 548, 554; 104 S Ct 845; 78 L Ed 2d 663 (1984) (quotation marks and citation omitted).

 Sullivan, 508 US at 281, quoting Rose, 478 US at 577.

 Neder, 527 US at 8.

 Ante at 124 n 6.

 See Black’s Law Dictionary (9th ed), p 1176.

 Id.

 For example, we would not say that the jurors were “sworn” if the they took the bailiffs oath, MCL 768.16, the interpreter’s oath, MCL 393.506(1), or the presidential oath of office, US Const, art II, § 1, cl 8.

 Neder, 527 US at 40 (Scalia, J., concurring in part and dissenting in part).

 Traynor, The Riddle of Harmless Error (Columbus: Ohio State University Press, 1970), p 14 (quotation marks and citation omitted).